# REPORTS OF CASES

## DETERMINED IN

# THE SUPREME COURT,

## JANUARY TERM, 1861.

---

### MOORE v. SMAW AND FREMONT v. FLOWER.

A PATENT from the United States for land in California, issued upon a confirmation of claims held under grants of the former Mexican Government, invests the patentee with the ownership of the precious metals which the land may contain.

The Act of March 3d, 1851, " To ascertain and settle Private Land Claims in California," does not restrict the operation of the patents, issued by the United States upon confirmation of the claims to the interests acquired by the claimants from the former Government, nor distinguish the patents so issued from other patents issued by the United States. Patents issued under the act are without words of reservation or limitation, except that they shall not affect third persons.

A patent of land from the United States passes to the patentee all the interest of the United States, whatever it may be, in everything connected with the soil, or forming any portion of its bed or fixed to its surface; in short, in everything embraced within the term " land."

The United States occupy, with reference to their real property within the limits of a State, only the position of a private proprietor—with the exception of exemption from State taxation—and their patent of such property is subject to the same general rules of construction which apply to conveyances of individuals.

Where individuals convey lands, the minerals of gold and silver pass unless expressly reserved.

Upon the separation of Mexico from Spain, the mines of gold and silver, which until that period were vested in the Spanish crown, passed to and vested in the Mexican nation.

Moore *v.* Smaw and Fremont *v.* Flower.

Under Mexican law, no interest in the minerals of gold and silver passed by a grant from the Government of the land in which they were contained, without express words designating them. Such grant only passed an interest in the soil distinct from that of the minerals.

The interest in the minerals was conveyed, through the operation of the mining ordinances, by registry of discovery, or by proceedings upon denouncement when a mine once discovered and registered had been abandoned or forfeited.

The history of the Spanish system of permitting the mines of gold and silver to be worked by individuals, stated.

At the date of the cession of California to the United States, no minerals of gold or silver had been discovered in the grants under consideration in this case, and hence, as no proceedings could have been taken by individuals to acquire any interest in them from the Government, they constituted, at that time, the property of the Mexican nation, and passed, by the cession, with all other property of Mexico within the limits of California, to the United States.

The minerals of gold and silver in this case which passed, by the cession, were not held by the United States in trust for the future State; and the ownership of such minerals did not vest in California upon her admission into the Union. Such ownership is not an incident of sovereignty; and the United States holds the minerals of gold and silver just as they hold any other public property which they acquired from Mexico.

*Hicks* v. *Bell*, (3 Cal. 219) holding that the mines of gold and silver found in the public lands are the property of the State by virtue of her sovereignty; and assuming that similar mines in the lands of private citizens also belong to her by the same right, overruled.

Sovereignty is a term used to express the supreme political authority of an independent State or nation. Whatever rights are essential to the existence of this authority are rights of sovereignty—as the right to declare war, to make treaties of peace, to levy taxes, to take private property for public uses, termed the right of eminent domain.

In this country, this authority is vested in the people, and is exercised through the joint action of their Federal and State Governments. To the Federal Government is delegated the exercise of certain rights or powers of sovereignty; and the exercise of all other rights of sovereignty, except as expressly prohibited, is reserved to the people of the respective States, or vested by them in their local governments.

To say that a State of the Union is sovereign, only means that she possesses supreme political authority, except as to those matters over which such authority is delegated to the Federal Government, or prohibited to the States—in other words, that she possesses all the rights and powers essential to the existence of an independent political organization, except as they are withdrawn by the provisions of the Constitution of the United States.

The ownership of the precious metals found in public or private lands is not one of the rights of sovereignty which the United States held in trust for the future State. Such ownership stands in no different relation to the sovereignty of a State than that of any other property which is the subject of barter or sale.

By the common law, the right to the mines of precious metals was not an incident of sovereignty, but a personal prerogative of the King, which could be alienated at his pleasure.

Moore *v.* Smaw and Fremont *v.* Flower.

APPEAL from the Thirteenth and Fifteenth Districts.

The appeal in the case of *Moore* v. *Smaw* is from the District Court of the Fifteenth District, county of Butte. The appeal in the case of *Fremont* v. *Flower* is from the District Court of the Thirteenth District, county of Mariposa. The appeals in both cases were considered together, as they involve a consideration of the same question. In *Moore* v. *Smaw*, the grant of the Mexican Government was issued to Dionisio and Maximo Fernandez; but the patent of the United States was issued, upon confirmation of the claim under the grant, to them and Josiah Belden and William R. Basham, who had become with them interested in the land granted. The concluding clause of the patent is as follows:

"The United States of America, in consideration of the premises, and pursuant to the provisions of the act of Congress aforesaid, of third of March, 1851, have given and granted unto the said Dionisio Z. Fernandez, Maximo Zinon Fernandez, Josiah Belden, and William R. Basham, and to their heirs, the tract of land embraced and described in the foregoing survey; but with the stipulation that in virtue of the fifteenth section of the said act, the confirmation of this said claim and this said patent shall not affect the rights of third parties; to have and to hold the said tract, with the appurtenances, unto the said Dionisio Z. Fernandez, Maximo Zinon Fernandez, Josiah Belden, and William R. Basham, and to their heirs and assigns, with the stipulation aforesaid.

"In testimony whereof, I, James Buchanan, President of the United States, have caused this letter to be made patent, and the seal of the General Land Office to be hereunto affixed," etc.

The plaintiff Moore alleged title in fee simple to the premises from which the gold in suit was extracted, by mesne conveyances from the patentees.

In *Fremont* v. *Flower*, the grant of the Mexican Government was issued to Juan B. Alvarado, who sold and conveyed his interest to Fremont, in 1847. The claim to the land under the grant was presented for confirmation by Fremont, and the patent of the United States was issued to him. Its concluding clause is as follows:

"That the United States of America, in consideration of the

14

premises, and pursuant to the provisions of the Act of Congress, aforesaid, of the third of March, 1851, have given and granted, and by these presents do give and grant unto the said John C. Fremont, as alienee of Juan B. Alvarado, and to his heirs, the tract of land embraced and described in the foregoing survey ; to have and to hold the said tract, with the appurtenances, unto the said John C. Fremont, as alienee of the said Juan B. Alvarado, and to his heirs and assigns forever.

" In testimony whereof, I, Franklin Pierce, President of the United States, have caused these letters to be made patent, and the seal of the General Land Office to be hereunto affixed.

" Given under my hand, at the city of Washington, this nineteenth day of February, in the year of our Lord one thousand eight hundred and fifty-six, and of the Independence of the United States the eightieth.

" Franklin Pierce.

[L. s.]  (Seal of the U. S. General Land Office.)

" By the President:

" Joseph S. Wilson,

" Acting Recorder of the General Land Office, *ad interim.*"

The demurrer in the case of *Moore* v. *Smaw* was overruled, and the defendant declining to answer, judgment final was entered for the plaintiff, from which the defendant appeals.

The case of *Fremont* v. *Flower* was presented to the Court below upon an agreed statement of facts, relating, principally, to the grant to Alvarado, under which Fremont claimed the land subsequently patented to him, the confirmation of the claim, the proceedings consequent thereon, and the issuance of the patent. The facts, as admitted, are sufficiently given in the opinion of the Court. Upon the agreed statement the Court below rendered judgment for the plaintiff; and the defendant appeals.  All other material facts are stated in the opinion.

*W. H. Rhodes*, for Appellant Smaw.

*Frank Turk*, for Appellant Flower.

I.   Under the laws of Spain, the minerals of gold and silver

belonged to the Sovereign, and did not pass in a grant of land. Upon the separation of Mexico from Spain, they vested in the nation.

II.   Upon the cession of California to the United States, the ownership of the precious metals passed from Mexico to the United States, and was held in trust for the new State.   Upon the admission of California, this ownership vested in her.   (*Hicks* v. *Bell*, 3 Cal. 219.)

III.   If the ownership of the minerals did not vest in the new State, it still remains in the United States.   The Act of March 3d, 1851, only provides for the recognition and confirmation of existing claims to land under Mexican grants, and the patents of the United States are only evidence of such recognition and confirmation.   The act does not purport to confer a title to property where none previously existed; and the patent is limited in its effect by the decree of confirmation which precedes it.   (See briefs filed on behalf of appellants in the case of *Biddle Boggs* v. *Merced Mining Co.*, 14 Cal. 315, 316, 346, and 352.)

*Charles T. Botts*, for Respondent Moore.

This case presents the naked question whether the patent of the United States invested the grantors of the plaintiff with a fee simple title to the minerals.   This is a question, which although not explicitly decided by this Court, has been elaborately argued before it.   There are two theories upon which the arguments against the plaintiff's claim are based; the first, that by the treaty of Guadalupe Hidalgo, the title to the minerals in the public lands of California vested in the United States, and did not pass, by virtue of their patent, to the grantors of the plaintiff; and the second, that the title to all the gold and silver mines in California vested in the State by right of sovereignty.

I.   Under the Spanish system, which was undoubtedly the Mexican system, the title to the minerals remained in the Supreme Government, as well those imbedded in private as in public lands.   By the treaty of Guadalupe Hidalgo, all the rights of property within the limits of California passed to the United States, and amongst them the national right to all the undiscovered and unappropriated.

minerals.    The title to the gold in controversy being in the Government of the United States, we have simply to ascertain whether it passed out of it by virtue of the patent executed to the plaintiff's grantors.    To determine this point, let us inspect the instrument of conveyance, and look especially at the granting words. We learn from the record that they run as follows: "The United States of America, in consideration of the premises, and pursuant to the provisions of the act of Congress aforesaid of third of March, 1851, have given and granted, and by these presents do give and grant unto the said (the plaintiff's grantors) and to their heirs, the tract of land," etc.    Then follows the superfluous stipulation that the grant is not to affect the rights of third parties.    No one doubts, we presume, that such terms of conveyance from A to B would carry to the latter all the right, title and interest of the former in and to the premises, with all that they contained, from the center of the earth to the top of the highest structure erected upon it. But it is said that under the common as well as the civil law, a grant by the sovereign did not carry the precious metals, unless they were specially included in the granting words.    That is undoubtedly true in most, if not all, civil law countries; and it was once, perhaps, true in England.    It may, possibly, be the case in New York.    But why is this?    Because by a general law in these countries the minerals are separated from the soil, and are declared not to pass with it.    Thus, in New York (1 vol. Rev. Stat.) it is declared by statutory enactment—"That all mines of gold and silver discovered, or hereafter to be discovered in this State, belong to the people in their right of sovereignty."

When the United States by statute express their intention to reserve the right to the minerals in the public lands, it may be that such a statute may affect such future words of conveyance as have been used to the plaintiff's grantors.    No such statute has yet been passed.

We say, then, that as a general principle under both the civil and common law, all the earth contained passed with the title to the soil.    In England, in early times (we shall hereafter show that the rule is different now) mines of gold and silver, and in Spain all mines of metals and precious stones were virtually excepted in the

Moore *v.* Smaw and Fremont *v.* Flower.

royal grants, simply because they were reserved as sources of public revenue.    When the State of California shall devote the mines in or the timber upon the public land to the support of government, then neither the one nor the other will pass to an individual by her patent.    Until such an act shall modify the general rule, both run with the land.

There is another view to be taken of this point.    It is claimed that the words *dedi et concessi* are to be differently construed when used by a sovereign and an individual proprietor.    But it is well settled that the Government of the United States takes nothing by virtue of inherent sovereignty, and that with respect to the public land she holds no other position than that of a private owner.

(*Hicks* v. *Bell*, 3 Cal. ; *United States* v. *The Railroad Bridge Co.*, 1 McLean, 517.)

But it is said that by force of the Act of 1851, under which the patent to the plaintiff's grantors was issued, the patent was only intended to confirm to the applicant such rights, powers and privileges as he held under the Mexican Government, and that the Supreme Court in the case of *The United States* v. *Fremont*, reported in 17th Howard, declares that the confirmation of his title imparted to Fremont no right to the minerals.    There is not the slightest foundation in the act, or the opinion, for this assertion.    It was clearly the intention of Congress to relinquish to a certain class of claimants all the right, title and interest of the United States to the lands of which they claimed to be the proprietors.    They intended to deal liberally with inchoate and imperfect titles, which either carelessness, ignorance or misfortune had prevented the claimants from perfecting.    In dealing with these titles, Congress resolved to pursue the fixed and uniform policy of the American Government, in preference to the Spanish and Mexican system of separating the ownership of the soil from that of the minerals it contains.

If it had been the intention of Congress to inaugurate a system so novel and so foreign to the spirit of our race and the genius of our institutions, as the Spanish and Mexican system, it would have been clearly expressed.    Here are the words of the act:

" For all claims finally confirmed by the said Commissioners, or

by the said District or Supreme Court, a patent shall issue to the claimant upon his presenting to the General Land Office an authentic certificate of such confirmation, and a plat or survey of the land, duly certified and approved by the Surveyor General of California."

The statute declares that to such claimants a patent shall issue. The word "patent" has a known legal meaning—it is a grant of land which carries to the grantee all the right, title and interest of the United States to the land described, *ab imo usque ad cælum.* By patent, the title to lands in the new States has been universally derived; by patent all lands in California will be eventually held, and if these patents leave in the General Government the right, which may be granted to others, to mine and dig for the precious metals, not a curtilage, not a graveyard, not a foot of ground is safe from the intrusion of the stranger.

Now, as to the Fremont case. Instead of arguing, as counsel have done in this Court, that the patent would not carry the minerals to the grantee, the counsel for the United States made the admitted fact that such would be the effect of a patent, the ground of their opposition to the confirmation. They said: This land contains mines of gold and silver, which by the Mexican law did not pass to the holder of the grant. Should you confirm this title, the grantee will obtain a patent, which will pass to him the minerals to which, by virtue of his original grant, he is not entitled. Therefore, do not confirm. To this the Court replied: We are acting under the Statute of 1851. In it we find no exception of mineral lands; we are directed to investigate all titles that are laid before us, and confirm or reject them upon the principles laid down for our guidance in the statute itself. Whether the confirmation and patent will vest a title to the minerals in the claimant, is a matter with which we have nothing to do in this case, and which can only be the subject matter of consideration in another and a different form of action.

So far, then, from finding anything in the Act of 1851, or the opinion in Fremont's case, in opposition to the view we maintain, we rely upon both for its support.

II. But it is contended that the ownership of the precious metals

Moore *v.* Smaw and Fremont *v.* Flower.

is an appurtenance of sovereignty, which remained in abeyance from the date of the treaty until California became a State. To sustain this proposition we are referred to " Case of Mines," Plowden's Reports, and *Hicks* v. *Bell*, 3 Cal.

What do we intend by the word sovereignty ? Every separate, independent political organization is termed a sovereignty. In this sense, neither the Federal Government nor the government of the States of this republic are sovereign. Through the two, the sovereign and independent community known as the United States of America exercises all the functions of sovereignty. When, then, we say that the State is sovereign, we mean this and only this ; that whilst the people of California have delegated to the Federal government certain specific sovereign powers, they have bestowed upon the State government, in general terms, all other powers that are necessary to the existence and continuance of a separate and independent political organization. We look to the Constitution of the State and that of the Federal government, not to find what sovereign powers are granted to the State government, but how they are limited and in what mode they are to be exercised. Hence it is said that the State government takes all sovereign power by virtue of her general sovereignty, whilst the general government can exercise only those powers distinctly granted and especially enumerated. But what are those powers that the State takes by virtue of her sovereignty ? They are those, which, not granted to the Federal Government, are absolutely necessary to the existence and continuance of a separate and independent political organization. If to the General Government had not been delegated the power of declaring war and making peace, inasmuch as they are necessary appurtenances of government, they would have attached without special grant to the State governments. So true is this, that had Congress not been granted the authority to raise revenue for the support of the General Government, however necessary to its existence such a power might have been, it could not have been inferred. Not so with the State government. The power to raise revenue is an inherent, inseparable appurtenance of sovereignty, and necessarily attaches to the State governments. We only look to the State Constitution to see how the power is limited, and how

it is to be exercised.    If the Constitution should be silent, the power would be unlimited and the mode discretionary.    So with the power of "eminent domain;" not being specially granted, it does not belong to Congress ; being an appurtenance of sovereignty it necessarily attaches to the supreme power of the State.    (*The United States* v. *The Railroad Bridge Co.*, 1 McLean, 517.)

It will thus be seen that the rights, privileges and powers that the State takes by virtue of her sovereignty, are those necessary and inseparable attributes of government which are not specifically assigned to the Federal department.    Is the proprietorship of the mines of gold and silver necessary to the existence of government ? The Exchequer Judges determined, in the case reported in Plowden, that it was a necessary appurtenance of the sovereign power of coinage.    By virtue of this authority, the mines would attach, not to the State, but to the Federal Government.    But the Judges in the Exchequer case fell into a grave error, both of fact and logic.    The ownership of bullion is not necessary to the exercise of the power of coinage.    The gold and silver mines were not claimed by the sovereigns of Great Britain as appurtenances to sovereignty, but as a source of revenue, and to aid in defraying the expenses of government.    (1 Blac. Com. 306.)

Blackstone reckons the ancient sources of revenue, as waifs, wrecks, estrays, deodands and mines, as things gone by and repealed by a system of equal and uniform taxation.

Sir Edward Coke, in the "Saltpeter case," in which he delivered the unanimous opinion of the twelve Judges of England, says :

" It was resolved that this taking of saltpeter is a purveyance of it for the making of gunpowder, for the necessary defense and safety of the realm, and for this cause, as in other purveyances, it is an incident inseparable to the crown, and cannot be granted, demised or transferred to any other, and cannot be converted to any use than for the defense of the realm, for which purpose only the law gave to the king this prerogative.    And it is not like the mines of gold and silver, for there the king hath interest in the metal."

For the last thirty years gold mines have existed in Virginia, North Carolina and Georgia.    Some of them are immensely valua-

ble, and they have passed with the land, and have been considered as much private property as the soil itself.   We have been able to find but one case in either of those States where any question of the kind seems to have arisen.   From a note to Kent's Commentaries, 3d vol. 378, we learn that in 1844 (before the institution of the Supreme Courts and the publication of the Georgia Reports) Mr. Justice Clayton, in the case of *The State of Georgia* v. *Canatoo*, a Cherokee Indian, held that " a right and title to land included a right to all the minerals therein, unless they were separated from the land by positive grant; and that if the State made a grant of public lands to an individual, without any exception of mines and minerals, the mines and minerals would pass to the grantee as part and parcel of the land."

But a historical examination will show the extent of this claim, and the fact that it has never been asserted either by the States or the General Government.   The States of Indiana, Illinois, Michigan, Wisconsin and a part of Ohio, were constructed out of a portion of the north-western territory ceded by Virginia to the United States in 1784.   Every foot of land in these States is held by patent from the General Government.   Within their limits are found valuable minerals, as well as mines of gold and silver.   Has it ever been pretended that the United States, or the State of Virginia, from whom they were originally obtained by grant, was entitled to such mines?   During the eighty years that have intervened since the act of cession, it has never been questioned that the grant from Virginia and the patents of the United States, which conveyed the soil, carried the minerals.

The State of Tennessee was carved out of the territory ceded to the General Government by North Carolina in 1789.   In the act of cession, all previous grants to individuals were confirmed; the remaining portion of private lands are held under patents.   Within the State are valuable mines of gold, and no one has ever questioned the title of the owner of the soil.   Louisiana, Arkansas, Missouri, Iowa and Minnesota were obtained from France by the treaty of 1803.   France and Spain, when they granted the soil to individuals, reserved the title to all mines of copper, lead, iron, cinnabar, gold and silver.   Gold, silver, iron, copper and lead have

been found in these States in large quantities; and yet, the proposition that such mines on private lands are. the property of either the United States, or of the several States in which they are found, is now for the first time set up.

*P. A. McRae,* also for Respondent Moore.

*Hall McAllister,* for Respondent Fremont.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

The records in these cases present for consideration the question whether a patent of the United States for land in California, issued upon a confirmation of a claim held under a grant of the former Mexican Government, invests the patentee with the ownership of the precious metals which the land may contain.   In the first case the complaint alleges that in March, 1860, the plaintiff was seized in fee and possessed of a tract of mineral land situated in Butte county, by virtue of a grant issued by Pio Pico, Governor of California, to Dionisio and Maximo Fernandez, on the twelfth of June, 1846, and a patent of the United States, issued on the fourteenth of October, 1857, pursuant to the Act of Congress of March 3d, 1851, for the settlement of private land claims in California; and that whilst thus seized the defendant entered upon the premises, and extracted and removed from the same large quantities of gold, of the value of four hundred dollars, " which gold was a part and parcel of the said premises, and as such, was and is the property " of the plaintiff; and concludes with a demand for damages to the amount of the alleged value of the gold thus extracted and removed.   To the complaint the defendant demurred, upon various grounds, the substance of which is, that the title of the plaintiff, as disclosed therein, was of such a character as to vest in him only the ownership of the soil, without any interest in the minerals of gold and silver which it contained.

In the second case the complaint alleges, that on the nineteenth of February, 1856, the plaintiff was seized in fee and possessed of certain premises situated in Mariposa county, and has been thus

seized and possessed ever since; that the premises contain large and valuable veins and mines of gold and gold-bearing quartz; that in November, 1860, the defendant entered upon the premises and extracted from the soil thereof five pounds of gold and ten tons of gold-bearing quartz, of the value of $2,000, then and ever since the property of the plaintiff, and removed the same and converted them to his own use; that the plaintiff has demanded of the defendant the delivery of this property, which is refused, and that the defendant still unjustly detains the same; and concludes with a demand of judgment for its possession, or for its value in case a delivery cannot be had.

The answer of the defendant admits the several allegations of the complaint, except as to the ownership of the plaintiff of the gold and gold-bearing quartz; and avers, that though the plaintiff is seized in fee of the premises, " he has not now and never has had any ownership of, or property or interest in the gold or gold-bearing quartz contained in the soil thereof; and in the first count that they are " the absolute and exclusive property of the State of California; " and in the second count that they are in like manner " the absolute and exclusive property of the United States."

The case was presented to the Court below upon an agreed statement of facts, and appears to be an amicable suit for the purpose of determining the question whether the precious metals passed to Fremont with the land in which they are contained under the patent of the United States.    The agreed statement relates principally to the grant to Alvarado, under which Fremont claimed the land in Mariposa, the confirmation of his claim, and the proceedings following such confirmation, and the patent issued to him.    The grant was the subject of elaborate consideration by the Supreme Court of the United States in the case of *Fremont* v. *The United States,* (17 How. 542) and in the report of the case it is set forth at length, together with the petition upon which it was made.    It is sufficient for the present case to state, that the grant was issued to Alvarado in 1844 by Micheltorena, the then Governor of California; that it was of a tract of land known as " Las Mariposas," to the extent of ten square leagues; that Alvarado conveyed his interest in the tract to Fremont in 1847; that the validity of the grant was determined

by the Supreme Court in December, 1854, and in pursuance of the mandate of that Court, a final decree of confirmation was entered by the District Court in June, 1855 ; that in July following the ten leagues were surveyed and segregated from the general tract embraced within the exterior boundaries designated in the grant, under the direction of the Surveyor General of the United States for California ; that the survey was subsequently approved by that officer, and that upon the survey and decree of confirmation a patent was issued by the United States on the nineteenth of February, 1856, signed by the President and countersigned by the acting Recorder of the General Land office at Washington, and bearing the seal of that office.   The patent refers to the grant, and the proceedings taken for the confirmation of the claim of Fremont thereunder, the judgment of the Supreme Court, and the final decree of the District Court, the survey in pursuance thereof and its approval, and concludes with the following granting clause :
" That the United States of America, in consideration of the premises and pursuant to the provisions of the Act of Congress, aforesaid, of the third of March, 1851, have given and granted, and by these presents do give and grant unto the said John C. Fremont, as alienee of Juan B. Alvarado, and to his heirs, the tract of land embraced and described in the foregoing survey, to have and to hold the said tract, with the appurtenances, unto the said John C. Fremont, as alienee of the said Juan B. Alvarado, and to his heirs and assigns forever."   This patent embraces the premises described in the complaint, from which the gold and gold-bearing quartz in controversy were extracted and removed.   All claim for damages for the entry upon the premises and the disturbance of the soil are expressly waived, and the claim of the plaintiff and the defense of the defendant both made to rest exclusively upon the question, whether the plaintiff has a right of property in the gold and gold-bearing quartz for the recovery of which the action is brought.

At the time the grants to the Fernandez and to Alvarado were issued, it was the established doctrine of the Mexican law that all mines of gold and silver in the country, though found in the lands of private individuals, were the property of the nation.   No inter-

Moore *v.* Smaw and Fremont *v.* Flower.

est in the minerals passed by a grant from the Government of the land in which they were contained, without express words designating them. By the ordinary grant of land, only an interest in the surface or soil, distinct from the property in the minerals, was transferred. The Mexican law on this subject was derived from the Spanish law, differing from it only in the particulars occasioned by the change in the Government of Mexico following the separation of the latter country from the Spanish monarchy. Under Spain, the mines constituted the property of the crown, as part of the royal patrimony. It was so declared in various laws at an ancient period. By a law of the Partidas, which were promulgated as early as 1343, it was declared that the mines were so vested in the King that they did not pass in his grant of the land, though not excepted in terms. (Law 5, tit. 15. P. 2.) By a law of Alphonzo XI, all mines of silver and gold, and of other metals, and the produce of the same, were declared to be the property of the crown, and no one was allowed to work them, except by special license or grant, or unless authorized by immemorial prescription. (Rockwell's Spanish and Mexican Laws, 126.) By a law of John I, this rule was modified, and a general license was granted to all persons to search for and work the mines in their own lands, and by permission of the owners, in the lands of others, and to retain one-third of the net produce, the balance to be rendered to the King. (Rockwell, 126.) Under this law few mines were discovered and worked, owing in part, as was supposed, to the fact that a great proportion of the mines of the country had been previously granted to noblemen, and others with bishoprics, arch-bishoprics, and provinces, with exclusive privileges. To remove the obstacles thus interposed to the discovery and development of the mineral wealth of the country, Phillip II, by a decree promulgated on the tenth of January, 1559, annulled all previous exclusive grants made by himself or his predecessors, except in those cases where the mines were at the time worked; and resumed and incorporated into his patrimony all the mines of gold, silver and quicksilver in his kingdom wherever found, " whether in public, municipal or vacant lands, or in inheritances, places and soils of individuals." (Halleck's Col. 6.) The object of this incorporation was not to restrict to the King the right to

search for and work the mines, but to extend this right freely to all persons.    Accordingly, in the second article of the decree, the King granted permission and authority to all his subjects and native citizens to search for and work mines of gold and silver in all lands of the kingdom, with certain specified exceptions, subject, however, to the payment to the crown of a certain proportion of the net produce derived from the mines discovered.    From the promulgation of this decree, the ownership of the precious metals by the Sovereign throughout the dominions of the Spanish monarchy was, in all subsequent legislation, fully recognized, and the policy of allowing all persons to search for, and upon discovery to work the mines, was rigidly followed.    Various ordinances, prescribing the extent of the acquisitions which might be made by individuals by discovery, and the manner in which the incipient right thus obtained should be authenticated, perfected and maintained, were passed at different periods.    It is unnecessary for the present case to refer particularly to their provisions.    It is sufficient to state, that they required a registry of the discovery before certain public officers, and that the registry when made operated as a concession of the mine to the discoverer, subject to certain conditions.    They all proceeded upon the admitted right of the crown to the minerals.    Those established on the twenty-second of August, 1584, and generally designated as the " New Ordinances," to distinguish them from regulations of an earlier date known as the " Old Ordinances," whilst revoking all previous laws, edicts, privileges and customs, in express terms excepted the decree of January 10th, 1559, so far as it vested in the crown all mines of gold, and silver and quicksilver, and annulled all grants which had been previously made.    These ordinances were in force not only in Spain, but in New Spain, which included California, until the year 1783.    In this latter year, the King gave his approval to the code of mining ordinances framed for New Spain by the general mining tribunal formed in 1778, and ordered that all their contents should be regarded as " law and statute, positive and perpetual," and be " inviolably observed, notwithstanding any other laws, ordinances, establishments, customs or practices to the contrary," which, so far as existing, were thereby expressly revoked. These ordinances were published by proclamation of the Viceroy

throughout New Spain in January, 1784. In the first article of the fifth title they declare that the mines are the property of the royal crown, as " well by their nature and origin, as by their reunion, declared in Law 4, Title 13, Book VI of the Nueva Recopilacion." The law thus named is the decree of Phillip II, of January 10th, 1559, to which we have already referred.

Upon the separation of Mexico from Spain, the mines, which until that period were vested in the Spanish crown, passed to and vested in the Mexican nation. Upon this subject Lares, a distinguished Mexican writer, says :

" The Mexican nation, having been declared free and independent of the Spanish Government, and of every other power, the seigniory of the King of Spain over the mines absolutely terminated, in like manner as terminated all the dominion and sovereignty which he might have exercised over the territory of the nation. What are, then, the principles recognized at present by legislation in regard to the mines ?

" The legislator has not occupied himself at all in making a formal declaration upon the matter, like that which was made in France, in 1791, nor upon a regulation, complete and definite, like that of 1810 ; but in those partial provisions which he has made upon the branch of mining, he has recognized in a manner implied, but clear and evident, the principle that the mines belong to the *nation*—declaring expressly that to it alone does it appertain to *grant* this class of property. Thus it is that in the decree of the General Congress of October 7th, 1823, enabling foreigners to make with the owners of mines contracts for every kind of supplies, even to the extent of acquiring in ownership shares in the operations which they supply, he reminds them that they have to remain subject in everything to our ordinances for the working of the mines, and to the other obligations and charges under which the *nation grants the ownership* of such parcels of ground to every citizen.

" Two principles, each most important, the legislator recognizes in this notable disposition—the first, that the ordinances of mining are in force, and by them must be regulated the working of the mines ; the second, that it is the nation which grants the ownership of the mines. But how could the nation *grant* that which it *has*

*not?*   And how would it be able to give to *one* that which it might have acknowledged to belong to *another?*   The law, therefore, has not recognized the property of the ' mine ' to be in the owner of the field, but has made it to consist in the *grant* which the nation makes to him who registers or denounces it in conformity with the ordinance.

" The same was the conception of the Decree of March 11th, 1842, which empowered foreigners to acquire real property.   In speaking of the mines, it empowers them to acquire in ownership those of which they should be the discoverers, in conformity to the ordinance upon that branch.   Here, again, is seen united the ownership with the grant, through the medium of the discovery, in the terms which the ordinance prescribes.

" There is, therefore, no doubt that our legislation, like the French, distinguishes the property of the soil from that of the mine ; recognizes that only the nation can grant the latter property ; and establishes that the grant is made in the manner which is determined in the Ordinance of 1783." (Lares' Derecho Administrativo, 91, 93.)

The minerals thus vested under the Spanish monarchy in the crown—and after the separation of Mexico, in the nation—did not pass, as we have already stated, by the ordinary grant of land, without express words of designation.   Such grant transferred only an interest in the soil distinct from that of the minerals.   The interest in the minerals was conveyed, through the operation of the mining ordinances, by registry of discovery, or by proceedings upon denouncement when a mine once discovered and registered had been abandoned or forfeited.*   At the date of the cession of Cali-

---

* NOTE.—Mr. Halleck, in his introductory remarks to his translation of De Fooz's work on the "Fundamental Principles of the Law of Mines," thus defines registry of discovery and denouncement:

" 1. Registry of discovery (*registro de mina nueva*).   In order to acquire the ownership of a mine newly discovered, the party must present a written application to the proper authority of the district where the mine is situate, (and if there be none in that district, then in the nearest one) setting out certain particulars in regard to himself and the mine he wishes to register; whereupon notices are posted up in certain public places; the mine must be opened and worked to a certain depth within a certain specified period; and after due inspection by the proper officers, the possession is given, and the limits or extent of the *pertenencias* are fixed.   These proceedings, known as the registry, constitute the concession; and the right or title thus acquired to the mine and its appurtenances remains in the party making the registry, his heirs and assigns, forever, unless forfeited or defeated for non-user, or for non-compliance with the conditions attached by law to its continuance.

fornia to the United States, no minerals of gold or silver had been discovered in the land embraced by the grant to the Fernandez or by the grant to Alvarado ; and of course no proceedings had been taken by which any individual interest in them was acquired from the Government. They constituted, therefore, at that time the property of the Mexican nation, and by the cession passed, with all other property of Mexico within the limits of California, to the United States.

We do not understand that this conclusion is controverted by the defendants ; but two positions are advanced by them which, though inconsistent with each other, would, if sustained, be equally availing against the claims of the plaintiffs—1st, that the minerals of gold and silver, which passed by the cession, were held by the United States in trust for the future State, and that upon the admission of California the ownership of them vested in her ; and 2d, that the minerals remain the property of the United States, and did not pass by their patents.

The first position finds support in the decision of. *Hicks* v. *Bell*, (3 Cal. 219) where this Court held that the mines of gold and silver found in the public lands are the property of the State by virtue of her sovereignty ; and assumed that similar mines in the lands of private citizens also belonged to her by the same right. That decision has not met the approbation of the profession or retained the approbation of the distinguished Judge who delivered it. The question as to the ownership of the minerals was not raised by counsel, and its determination was not required for the

"2. Denouncement of an old mine (*denuncio de mina abandonada*). The proceedings by which the ownership of an old mine is acquired are the same as those of making registry of a mine newly discovered, except that instead of adducing proof of discovery, evidence must be given of the abandonment by the former owner, or that for some other reason the mine has become subject to denouncement (*o considera por algun otro motivo denunciable*). The former owner, if he be known, and the occupants of the adjacent mines must be duly notified, and public notices given in the manner prescribed. At the expiration of the proper time, and on the hearing of the case, the mine may be declared vacant, and the possession of it given to the denouncer, who thus becomes the next owner. There is, therefore, no essential difference between registry and denouncement; indeed, the new title acquired to the mine denounced results from the act of registry. Gamboa, therefore, very properly considers the two acts as virtually the same—one name being applied to a newly discovered mine, and the other to an old one. Moreover, the term denouncement is not unfrequently applied to the act of making known the discovery of a new mine; and even when used with respect to an old one, it is properly applicable only to that part of the proceedings by which the mine is alleged, proved, and declared vacant; those by which the new ownership is acquired being, in fact, an act of new registry."

disposition of the case. But independent of this consideration, which only goes to the force of the decision as authority, we are clear that the doctrine there advanced cannot be sustained. It is undoubtedly true that the United States held certain rights of sovereignty over the territory which is now embraced within the limits of California, only in trust for the future State, and that such rights at once vested in the new State upon her admission into the Union. But the ownership of the precious metals found in public or private lands was not one of those rights. Such ownership stands in no different relation to the sovereignty of a State than that of any other property, which is the subject of barter and sale. Sovereignty is a term used to express the supreme political authority of an independent State, or nation. Whatever rights are essential to the existence of this authority are rights of sovereignty. Thus the right to declare war, to make treaties of peace, to levy taxes, to take private property for public uses, termed the right of eminent domain, are all rights of sovereignty, for they are rights essential to the existence of supreme political authority. In this country this authority is vested in the people, and is exercised through the joint action of their Federal and State Governments. To the Federal Government is delegated the exercise of certain rights or powers of sovereignty; and with respect to sovereignty, rights and powers are synonymous terms; and the exercise of all other rights of sovereignty, except as expressly prohibited, is reserved to the people of the respective States, or vested by them in their local governments. When we say, therefore, that a State of the Union is sovereign, we only meant hat she possesses supreme political authority, except as to those matters over which such authority is delegated to the Federal Government, or prohibited to the States; in other words, that she possesses all the rights and powers essential to the existence of an independent political organization, except as they are withdrawn by the provisions of the Constitution of the United States. To the existence of this political authority of the State— this qualified sovereignty, or to any part of it—the ownership of the minerals of gold and silver found within her limits is in no way essential. The minerals do not differ from the great mass of property, the ownership of which may be in the United States, or in

individuals, without affecting in any respect the political jurisdiction of the State.    They may be acquired by the State, as any other property may be, but when thus acquired she will hold them in the same manner that individual proprietors hold their property, and by the same right ; by the right of ownership, and not by any right of sovereignty.

In *Hicks* v. *Bell,* the Court states correctly that, according to the common law of England, mines of gold and silver were the exclusive property of the Crown, and did not pass in a grant of the King under the general designation of lands or mines ; but it assumes that this right of the Crown—this regalian right—vested in the State.   " It is hardly necessary," in the language of the opinion, " at this period of our history to make an argument to prove that the several States of the Union, in virtue of their respective sovereignties, are entitled to the jura regalia which pertained to the King at common law."    It is in this assumption that the error of the decision consists.    Under the general designation of jura regalia are comprehended not only those rights which pertain to the political character and authority of the King, but also those rights which are incidental to his regal dignity, and may be severed at his pleasure from the Crown and vested in his subjects. It is only to certain rights of the first class that the States, by virtue of their respective sovereignties, are entitled.    It is to the second class that the right to the mines of gold and silver belongs.

In the great case of *The Queen* v. *The Earl of Northumberland,* (1 Plowden, 310)  which was argued before the Barons of the Exchequer and all the Justices of England, it was held by their unanimous judgment, " that by the law all mines of gold and silver within the realm, whether they be in the lands of the Queen or of subjects, belong to the Queen by prerogative, with liberty to dig and carry away the ores thereof, and with other such incidents thereto as are necessary to be used for the getting of the ore ;" and also, " that a mine royal, either of base metal containing gold or silver, or of pure gold and silver only, may, by the grant of the King, be severed from the Crown, and be granted to another, *for it is not an incident inseparable to the Crown, but may be severed from it by apt and precise words.*"    This case was decided in 1568,,

during the reign of Queen Elizabeth, and continues unto this day an authoritative exposition of the doctrine of the common law. It is conclusive to the point that the right to the mines was not regarded by that law as an incident of sovereignty, but was regarded as a personal prerogative of the King, which could be alienated at his pleasure.

No reasons in support of the prerogative are stated in the resolution of the Judges, and those advanced in argument by the Queen's counsel would be without force at the present time. Onslow, the Queen's solicitor, says Plowden, "alleged three reasons why the King shall have mines and ores of gold and silver within the realm, in whatsoever land they are found. The first was, in respect to the excellency of the thing, for of all things which the soil within this realm produces or yields, gold and silver is the most excellent, and of all persons in the realm, the King is, in the eye of the law, most excellent. And the common law, which is founded upon reason, appropriates everything to the person whom it best suits, as common and trivial things to the common people, things of more worth to persons in a higher and superior class, and things most excellent to those persons who excel all other; and because gold and silver are the most excellent things which the soil contains, the law has appointed them (as in reason it ought) to the person who is most excellent, and that is the King.    *    *    The second reason was, in respect of the necessity of the thing. For the King is the head of the Weal-public and the subjects are his members; and the office of the King, to which the law has appointed him, is to preserve his subjects; and their preservation consists in two things, viz: in an army to defend them against hostilities, and in good laws. And an army cannot be had and maintained without treasure, for which reason some authors, in their books, call treasure the sinews of war; and, therefore, inasmuch as God has created mines within this realm, as a natural provision of treasure for the defense of the realm, it is reasonable that he who has the government and care of the people, whom he cannot defend without treasure, should have the treasure wherewith to defend them.    *    *    The third reason was, in respect of its convenience to the subjects in the way of mutual commerce and

Moore *v.* Smaw and Fremont *v.* Flower.

traffic. For the subjects of the realm must, of necessity, have intercourse or dealing with one another, for no individual is furnished with all necessary commodities, but one has need of the things which another has, and they cannot sell or buy together without coin. * * And if the subject should have it (the ore of gold or silver) the law would not permit him to coin it, nor put a print or value upon it, for it belongs to the King only to fix the value of coin, and to ascertain the price of the quantity, and to put the print upon it, which being done, the coin becomes current for so much as the King has limited. But if the subject should have the ore of gold and silver which is found in his land, he could not convert it into coin, nor put any print or value on it. For if he makes coin, it was high treason by the common law before the statute of 25th Ed., 3 Cap. 2, as it appears by 23d Ass., where a woman was burnt for forging or counterfeiting money, and it was high treason to the King, because he has the sole power to make money. So that the body of the realm would receive no benefit or advantage if the subject should have the gold and silver found in mines in his land ; but on the other hand, by appropriating it to the King, it tends to the universal benefit of all the subjects in making their King able to defend them with an army against all hostilities, and when he has put the print and value upon it, and has dispersed it among his subjects, they are thereby enabled to carry on mutual commerce with one another, and to buy and sell as they have occasion, and to traffic at their pleasure. Therefore, for these reasons, viz : for the excellency of the thing, and for the necessity of it, and the convenience that will accrue to the subjects, the common law, which is no other than pure and tried reason, has appropriated the ore of gold and silver to the King, in whatever land it be found."

It would be a waste of time to show that none of the reasons thus advanced in support of the right of the Crown to the mines can avail to sustain any claim of the State to them. The State takes no property by reason of " the excellency of the thing," and taxation furnishes all the requisite means for the expenses of Government. The convenience of citizens in commercial transactions is undoubtedly promoted by a supply of coin, and the right of coin-

age appertains to sovereignty.    But the exercise of this right does not require the ownership of the precious metals by the State, or by the Federal Government, where this right is lodged under our system, as the experience of every day demonstrates.

The right of the Crown, whatever may be the reasons assigned for its maintenance, had in truth its origin in an arbitrary exercise of power by the King, which was at the time justified on the ground that the mines were required as a source of revenue.    The same regalian right was recognized on the continent, as in England, and of its origin, Gamboa in his commentary on the mining ordinances of Philip II, thus speaks : " Upon the breaking up of the Roman Empire, the Princes and States which declared themselves independent, appropriated to themselves those tracts of ground in which nature has dispensed her most valuable products with more than ordinary liberality, *which reserved portions or rights were called rights of the Crown.*    Among the chief of the valuable products are the metallic ores of the first class, as those of gold and silver and other metals proper for forming money, which it is essential for sovereigns to be provided with in order to support their warlike armaments by sea and land, to provide for the public necessities, and to maintain the good government of their dominions."

It follows from the views we have thus expressed, that the first position advanced by the defendants cannot be sustained ; that the gold and silver which passed by the cession from Mexico were not held by the United States in trust for the future State ; that the ownership of them is not an incident of any right of sovereignty ; that the minerals were held by the United States in the same manner as they held any other public property which they acquired from Mexico ; and that their ownership over them was not lost, or in any respect impaired by the admission of California as a State.

The second position of the defendants is, that if the minerals did not vest in the State by her admission into the Union, they remained the property of the United States notwithstanding their patents to the Fernandez and to Fremont.    This position is not based upon any language of the patents ; for it is admitted that their terms of grant would operate in case of a conveyance of an individual, to pass all the interest which the grantor could possess

Moore *v.* Smaw and Fremont *v.* Flower.

in the land.   It is based upon the supposition that as the Act of March 3d, 1851, provides for the recognition and confirmation of the rights acquired by the grants from Mexico, the patents were only intended as evidence on the part of the United States of such recognition and confirmation.   By those grants, as we have seen, no interest in the minerals of gold and silver passed to the grantees, and if the patents amount only to an acknowledgment of the rights derived from the former Government, that interest still remains in the United States.   This view of the patents is not justified by any provisions of the act.   The object of the act is to "ascertain and settle" private land claims in California.   This object is declared in the first section.   It is not merely to ascertain but "to settle" the claims ; that is, to establish them—to perfect them by placing them, so far as the Government is concerned, beyond controversy. This ascertainment is intrusted by the act to a Board of Commissioners, and to the Courts.   By proceedings before them the validity of the claims is determined ; yet little benefit would result to the claimants from such determination, if the act required or authorized nothing further.   Many of the claims held in this State fall far short, even when confirmed, of being available titles ; some are mere inchoate titles ; some are equitable titles ; and some are to specific quantities of land situated within boundaries embracing a much larger extent.   The act, therefore, provides for proceedings to be taken after the claims have been subjected to the investigation of the Board and the Courts.   The lands claimed are to be surveyed and segregated from the public domain by the officers of the Government, and patents are to issue to the claimants.   The issuance of the patents does not depend upon the character of the claims—whether they be legal or merely equitable, or whether they be of specific tracts or floating interests.   It depends solely upon the recognition of their validity by the decree of confirmation. "For all claims finally confirmed," reads the act, "by the said Commissioners, or by the said District or Supreme Court, a patent shall issue to the claimant upon his presenting to the General Land Office an authentic certificate of such confirmation, and a plot or survey of the said land, duly certified and approved by the Surveyor General of California."

There is nothing in the act restricting the operation of the patents thus issued to the interests acquired by claimants from the former Government, or distinguishing the patents in any respect from the general class of conveyances made, under that designation, by the United States. To all claimants alike, whose claims have been finally confirmed, patents are to issue without words of reservation or limitation, with the exception that they shall not affect the interests of third persons, an exception which would exist independent of its legislative recognition. Such being the case, the question arises as to what passed by the patents to the Fernandez and to Fremont, and to this question there can be but one answer: all the interest of the United States, whatever it may have been, in everything connected with the soil, in everything forming any portion of its bed or fixed to its surface, in everything which is embraced within the signification of the term land; and that term, says Blackstone, "includes not only the face of the earth, but everything under it or over it. And, therefore," he continues, "if a man grants all his lands, he grants thereby all his mines of metal, and other fossils, his woods, his waters, and his houses, as well as his fields and meadows." (Book II, 19.) Such is the view universally entertained by the legal profession as to the effect of a patent from the General Government. The United States occupy, with reference to their real property within the limits of the State, only the position of a private proprietor, with the exception of exemption from State taxation, and their patent of such property is subject to the same general rules of construction which apply to conveyances of individuals. From the operation of conveyances of this nature, that is, of individuals, the minerals of gold and silver are not reserved unless by express terms. They pass with the transfer of the soil in which they are contained. And the same is true of the operation of the patent—the instrument of transfer of the governmental proprietor, the United States; no interest in the minerals remains in them without a similar reservation. Nor is there anything in the language of the Supreme Court, in the opinion rendered in the Fremont case, which gives countenance to any other view. The Attorney General of the United States objected to the confirmation of the claim of Fremont upon the ground

Moore *v.* Smaw and Fremont *v.* Flower.

that the grant to Alvarado contained mines of gold and silver. His argument was to this effect: that as the mines did not pass to the grantee by the Mexican law, the claim should not be confirmed, as Fremont would obtain as a consequence of such confirmation a patent which would pass the minerals, to which, by the original grant, he was not entitled. But to this the Court replied that, under the mining laws of Spain, the discovery of a mine of gold and silver did not destroy the title of the individual to the land granted, and that the only question before the Court was the validity of the title; and whether there were any mines in the land, and if there were any, what were the rights of sovereignty in them, were questions which must be decided in another form of proceeding, and were not submitted to the jurisdiction of the Commissioners or the Court by the Act of 1851; in other words, the Court said in substance, that its consideration was confined to the title presented, and the effect of its decree and the patent following it upon the ownership of the minerals was a matter with which it had nothing to do.

The construction given by the United States to their patents, ever since the organization of the Government, has uniformly been to the same effect. In several of the States, particularly those carved out of territories ceded by Virginia, North Carolina and Georgia, and out of the territory acquired by the treaty with France in 1803, and by the treaty with Spain in 1819, the title to a large portion of the lands is held under patents from the United States. Some of these patents were issued upon a sale of lands; some of them upon a donation of lands; and some of them upon a confirmation by Boards of Commissioners of previously existing grants of the former Governments. They were issued to extensive tracts in the Territories of Louisiana, Mississippi and Florida, and in many cases, they embraced lands in which minerals of gold and silver and other metals existed. Yet in no instance, whether the patents were issued upon a sale or donation of lands, or upon a confirmation of a previously existing grant, have the United States asserted any right to the mines as being reserved from the operation of the patents. They have uniformly regarded the patent as transferring all interests which they could possess in the soil,

and everything imbedded in or connected therewith.   Whenever they have claimed mines, it has been as part of the lands in which they were contained, and whenever they have reserved the minerals from sale or other disposition, it has only been by reserving the lands themselves.   It has never been the policy of the United States to possess interests in land in connection with individuals.

Judgment affirmed.

*Moore* v. *Smaw.*—BALDWIN, J.—I concur in the judgment in this case for the reasons given by the Chief Justice.