[No. 13107.   In Bank.—October 3, 1889.]

WILLIAM G. RICHARDS ET AL., RESPONDENTS, v. JOHN DOWER ET AL., APPELLANTS.

TOWN-SITE PATENT — RESERVATION OF GOLD MINE. — To constitute a reservation of a gold mine from the operation of a town-site patent, under the laws of Congress, there must be a natural deposit of rock or earth containing a sufficient quantity of gold to admit of profitable working, and the land must be known to have been more valuable for mineral than for agricultural purposes at the date of the town-site patent, or before the occupation or improvement of the lots for residences or business under the town-site title.

ID. — PLEADING — RESERVATION — MINERAL LANDS — CONCLUSIONS OF LAW. — When an answer alleges as matter of fact that a ledge claimed by defendants, which crosses a town lot claimed by plaintiff, was known to be a gold-bearing ledge, and was held, possessed, worked, and mined as such long prior and subsequent to the town-site patent, further allegations, to the effect that the mine was reserved from the patent, and that it is part of the public mineral lands of the United States, are allegations of mere conclusions of law.

ID. — FINDINGS — VALUE — OWNERSHIP. — When there is a general issue as to the ownership and right of possession of a quartz ledge situated within the limits of a town-site, and a finding is made upon such issue against the defendants, it is not necessary for the court to make a specific finding as to the value of the ledge, or its supposed value at the date of the town-site patent, from the operation of which defendants claim that the ledge was reserved. The finding that it was of no apparent value at that date will, if necessary to support the judgment, be deemed to be embraced in the more general findings.

ID. — BURDEN OF PROOF — ABANDONMENT OF LEDGE. — The burden is on a mining claimant, who claims a quartz ledge under a location made within the limits of a town-site after the date of the town-site patent, to prove that the ledge was known to be valuable for mining purposes within the boundaries of the town-lot in controversy at the date of the patent or before its improvement for residence under the town-site title. It cannot be presumed that because the ledge was once profitably worked before the town-site patent, it must be deemed to have continued valuable at the date of the patent, if work on the ledge was abandoned before the date of the patent.

ID. — EFFECT OF ABANDONMENT — POSSESSIO PEDIS. — When the evidence is sufficient to show an intention to abandon work on a mine, as having become valueless, the *possessio pedis* by the miners of shafts, tunnels, inclines, dumps, and stopes on the vein, if continuing until the date of a town-site patent, would not amount to a mining claim, or have the effect to prevent the land on which they were situated from passing by the town-site patent.

ID. — EVIDENCE — SALE OF MINING CLAIM. — Proof of the sale of a mining claim for a specific price, under probate proceedings two years after the date of a town-site patent, is not competent evidence of the known or estimated value of the mine at the date of the patent.

APPEAL from a judgment of the Superior Court of Nevada County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*H. L. Gear,* for Appellants.

*P. F. Simonds,* and *Fred. Searls,* for Respondents.

BEATTY, C. J.—This is an action to recover two lots in the city of Nevada. Plaintiffs had judgment, from which and an order denying a new trial defendants appeal.

The facts out of which the case arises are as follows: A patent for the town site of Nevada was issued by the

United States, July 1, 1869, and whatever title to these lots passed by the patent was vested in the plaintiffs at the commencement of the action.

But the defendants claim that the portion of the lots which is in their possession was not granted by the patent, being reserved or excepted out of its operation by reason of the fact—by them alleged—that it contained a gold-bearing quartz vein, the existence of which was known at and before the date of the patent, and which has, since that date, been located by them in pursuance of the mining laws of the United States.

From this general statement, it will be seen that the question to be decided is, whether or not the premises in controversy were reserved out of the land patented for a town site. The determination of this question involves a construction of the laws of the United States relating to town sites and mineral lands, and a consideration of the state of facts existing and known at the date of the patent.

And first, as to the facts: It appears, from the findings of the superior court and from the evidence, that for many years prior to the year 1869, a gold-bearing quartz ledge was known to exist within the limits of these lots, extending across the lots and for a considerable distance outside of them. As early as the year 1851 it was known as the Wagner ledge, and was worked apparently at a profit by a man of that name. It does not appear that the vein, or any part of it, was ever regularly located in accordance with the law or local miners' rules prior to the town-site patent, or that any title or right of possession in it was ever transferred by deed or other mode of conveyance from one to another of the various parties who at different times have mined upon it. The defendants do not pretend to connect themselves in any way with those who mined there prior to the issuance of the town-site patent.

After Wagner ceased to work on the vein, other par-

ties, in succession, worked there, from time to time, until the winter of 1868–69, at which time, and prior to the issuance of the patent,—according to the findings,—work on the ledge was abandoned, and none was thereafter performed until defendants, in 1884, made the location under which they claim.

It is contended by the appellants that this finding is in conflict with the evidence; and it is true that one witness did testify that he saw "a man named Smith" at work on the vein after 1869,—perhaps as late as 1876. His testimony, however, was extremely vague and uncertain. He could not fix the time when or the place where he saw Smith at work. He says it was on the vein, but not inside of these lots, and was, perhaps, as much as four hundred yards distant from them. But even if his testimony had been much more positive than it was, we cannot say that the court would have been bound to accept it. The fact sought to be established, viz., the working of a gold mine within the limits of a populous town, would necessarily, if a fact, have been known to many persons, and, considering the important effect attributed to it, ought to have been proved by stronger evidence than the uncertain testimony of one witness.

But aside from this, the question here is as to the existence of a mine known at the date of the patent within the boundaries of these lots, and even if it had been clearly proved that one man worked on the Wagner vein as late as 1876, at a point four hundred yards outside of the lots, that would have been a circumstance of very slight evidentiary value with reference to the matter to be proved. He might have found nothing where he was at work, and if he did find gold in paying quantities at that point, it would not have proved that the same grade of ore was to be found at a distance of four hundred yards. It is well known that veins rich at one point are often barren at a few yards distance. But what is more

to the purpose here is, that veins are frequently worked out and abandoned from point to point on their course until they are wholly exhausted. The evidence in this case shows that the Wagner vein was scarcely more than a foot in thickness; that some hundreds of tons of rock had been extracted from it within the boundaries of these lots prior to 1869; that it had been worked down to the water-line by means of shafts, drifts, tunnels, etc. Add to this the fact that from 1869 to 1884, a period of more than fifteen years, it lay idle and untouched in the midst of one of the busiest and most enterprising mining regions of the state, and the conclusion is irresistible that from the time work on it ceased in the winter of 1868–69, it was regarded as a worked-out and valueless lode,—so much of it, at least, as was embraced within the lines of these lots.

It is true there is no express finding of the superior court to this effect, and the judgment for plaintiff seems to have gone upon other grounds, but certainly the evidence would have sustained such a finding, if an issue upon the specific point had been raised by the pleadings. There was, however, no such issue. The complaint merely alleges ownership and right of possession, which is denied by the answer. The answer, it is true, goes further than a mere denial, and attempts to state a special defense by averring that plaintiffs have no right except under the town-site patent, and that the demanded premises were reserved in the patent. But the only *allegation of fact* upon this point is, "that the said Wagner ledge and the portion thereof which crosses the said lands was known to be a gold-bearing ledge, and was held, possessed, worked, and mined as such long prior and subsequent to said patent." Other allegations to the effect that the mine was reserved, that it is part of the public mineral lands of the United States, etc., are mere conclusions of law. It was unnecessary, therefore, for the court to make a specific finding as to the value of

the mine, or its supposed value, at the date of the patent. The fact that it was of no apparent value at that date will, if necessary to support the judgment, be deemed to be embraced in the more general findings in response to the issues raised.

Assuming, then, that at the date of the issuance of the town-site patent that part of the Wagner ledge embraced in these lots was regarded as worked out and as of no further value for mining purposes, we find that the predecessors of plaintiffs purchased the lots from the patentee, went into possession of them, fenced them, divided them into different inclosures, built valuable houses and outhouses upon them, planted them with fruit-trees, filled up the old mining excavations, and, in short, devoted them to the purposes of a home.

After fifteen years, and more, during which there was a complete cessation of mining on the lode, the defendants entered upon the possession of the plaintiffs, made a location of the ledge, claiming three hundred feet of surface on each side of the croppings,—a strip six hundred feet in width across plaintiffs' lots,—and proceeded to dig up their garden and orchard, demolish their fences, and undermine their houses.

All this the defendants justify upon the ground that the ledge and adjacent surface which they have located was reserved by the United States out of the land patented to the town-site trustee. It remains to consider whether they are correct in their construction of the law upon this point.

They rely upon the following clause of section 2392 of the Revised Statutes of the United States: "No title shall be acquired under the foregoing provisions of this chapter to any mine of gold, silver, cinnabar, or copper, or to any valid mining claim or possession under existing laws."

This clause of the Revised Statutes had no existence in its present form at the date of the patent for the

Nevada town site. At that date the revision had not been made, and we must look to the town-site laws in the Statutes at Large to ascertain whether they contained equivalent provisions. The laws referred to are the act of March 2, 1867, 14 Stats. at Large, p. 541, and the act of June 8, 1868, 15 Stats. at Large, p. 67. The first contained the following proviso: "That no title shall be acquired under the provisions of this act to any mine of gold, silver, cinnabar, or copper." The second, which was amendatory of the first, contained the following proviso: "That no title under said act of March 2, 1867, shall be acquired to any valid mining claim or possession held under the existing laws of Congress."

The appellants contend that in July, 1869, both these provisos were in force; the respondents, on the contrary, claim that the second was substituted for the first, and that nothing was reserved at the date of the patent in question except "valid mining claims or possessions held under existing laws of Congress."

We find it unnecessary to decide which of these opposing views is correct. For the purposes of this case, we will assume, without deciding, that the appellants are right, and that, not only mining claims, but all known mines, whether claimed or not, were reserved from the grant.

The question, then, is reduced to this: What was a mine of gold within the meaning of the act of 1867? Without the aid of any judicial or legislative construction, we should say without hesitation that one essential requisite of a gold mine would be a natural deposit of rock or earth containing a sufficient quantity of gold to admit of profitable working. If lands are known to contain precious metals, but in quantities so small as not to justify the attempt to extract them, they are not properly called mineral lands, and even if they might be mined at a very small profit, but are clearly of more value for agriculture than for mining, they are agricultural rather than mineral lands.

There is abundance of authority for this view. We know of nothing in the statutes of the United States, as they existed in July, 1869, which indicates a more jealous policy with respect to mineral lands than is manifested by the following provision of the Revised Statutes: "In all cases, lands *valuable for minerals* shall be reserved from sale, except as otherwise expressly directed by law." (Sec. 2318.) This is a clear declaration that the present policy of the government is to reserve only such mineral lands as are *valuable* as such, and there is no reason to suppose that it ever had a different policy.

In the case of *Deffenback* v. *Hawke*, 115 U. S. 392,— a case much relied on by appellants,— although the decision was in favor of the mineral claimant, who held a patent for his mine, and against the town-lot claimant, who had no patent, the carefully guarded language of the opinion of the court limiting the operation of the principles decided has all the force of a direct adjudication against the appellant on the point we are considering. We quote the following (page 404): "It is plain, from this brief statement of the legislation of Congress, that no title from the United States *to land known at the time of sale to be valuable* for its minerals of gold, silver, cinnabar, or copper can be obtained under the pre-emption or homestead laws or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands. . . . . We say 'land *known* at the time to be *valuable* for its minerals,' as there are vast tracts of public land, in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral,' in the sense of the statute, is applicable. In the first section of the act of 1866, no designation is given of the character of mineral lands which are free and open to exploration. But in the act of 1872, which repealed that section, and reenacted one of broader import, it is '*valuable* mineral

deposits' which are declared to be free and open to exploration and purchase. The same term is carried into the Revised Statutes. It is there enacted that 'lands valuable for minerals' shall be reserved from sale, except as otherwise expressly directed, and that 'valuable mineral deposits' in lands belonging to the United States shall be free and open to exploration and purchase. We also say lands 'known at the time of their sale to be thus valuable,' in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterward, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the government under the pre-emption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We, therefore, use the term 'known to be valuable at the time of sale,' to prevent any doubt being cast upon titles to lands afterward found to be different in their mineral character from what was supposed when the entry of them was made, and the patent issued."

And again, on pages 406, 407, note the following language: "Whilst we hold that a title to known valuable mineral land cannot be acquired under the town-site laws, and therefore could not be acquired to the land in controversy under the entry of the town site of Deadwood by the probate judge of the county in which the town is situated, we do not wish to be understood as expressing any opinion against the validity of the entry so far as it affected property other than mineral lands, if there were any such at the time of the entry. The acts of Congress relating to town sites recognize the possession of mining claims within their limits; and in Steel v. Smelting Co., 106 U. S. 447, 449, we said that 'land embraced within a town site on the public domain, when unoccupied, is not exempt from location and sale'

for mining purposes; its exemption is only from settle-
ment and sale under the pre-emption laws of the United
States.   Some of the most valuable mines in the coun-
try are within the limits of incorporated cities which
have grown up on what was at its first settlement part
of the public domain, and many of such mines are
located and patented after a regular municipal govern-
ment had been established.   Such is the case with some
of the famous mines of Virginia City, in Nevada.   In-
deed, the discovery of a rich mine in any quarter is usu-
ally followed by a large settlement in its immediate
neighborhood, and the consequent organization of some
form of local government for the protection of its mem-
bers.'   It would seem, therefore, that the entry of a
town site, even though within its limits mineral lands
are found, would be as important to the occupants of
other lands as if no mineral lands existed.   Nor do we
see any injury resulting therefrom, nor any departure
from the policy of the government, the entry and the
patent being inoperative as to all lands *known at the time
to be valuable for their minerals, or discovered to be such before
their occupation or improvement for residence or business
under the town-site title.*"

These extracts from the opinion of the highest judi-
cial tribunal of the country show very clearly and pre-
cisely what are the limitations upon the right which the
defendants are attempting to assert, and what is the
effect of the *provisos* above quoted reserving mineral
lands, mines, and mining claims from the operation of
town-site patents.   A mine is not reserved unless it is
not only *known,* but *known to be valuable* at the date of
the patent, *or discovered to be so before the occupation or
improvement of the lots containing them for residences or
business under the town-site title.*

Here the defendants admit that the lots in controversy
are within the description of the patent, and they must
assume, as they have in fact done, the burden of show-

ing that they are of the class of lands excepted from its operation.

This they have failed to do, both in their allegations and in their proofs, by failing to show that that portion of the Wagner ledge included within the boundaries of these lots was *known to be valuable for mining purposes at the date of the patent, or discovered to be so before plaintiffs and their predecessors occupied and improved them for the purposes of residence under the town-site title.*

The tacit assumption upon which appellants base their whole argument, viz., that this ledge, having once been profitably worked, must be deemed to have continued valuable, cannot be admitted. It is a matter of universal knowledge that California is full of quartz veins which have been worked at a profit for a time, and have been finally abandoned,—often after sinking more money in them than had ever been taken out of them,—and there are large areas where placer mining was formerly conducted successfully, which now, after being exhausted of their gold, are held and occupied as farming and grazing lands under patents from the United States. When upon lands of this character mineral discoveries are made, the agricultural claimant is protected against mining locators. (*Cowell* v. *Lammers,* 10 Saw. 246.)

The foregoing views dispose of the main contention of the parties to this appeal, but we will notice briefly some specific assignments of error.

The finding of the court that work on the ledge was abandoned prior to the issue of the town-site patent is not contrary to the evidence. Our reasons for this conclusion have been already stated.

The *possessio pedis* of Hughes and Lovey and Sigourney & Co. of the shafts, tunnels, inclines, dumps, and stopes on the vein, even if it had actually continued down to the date of the patent—and it is not shown to have done so—would not have had the effect of preventing the land in which they were situated from passing

by the town-site patent.   If there was no mine of value, and if they had abandoned all work on the mine, as the evidence shows they had done, their possession of the shafts, dumps, etc., would not have amounted to a mining claim, and nothing but a mine or a mining claim was reserved.   Beside, the evidence was sufficient to prove an actual intention of these old miners to abandon the mine at the time they ceased to work it, in the winter of 1868–69.

The court did not err in excluding evidence offered to show that in 1871, after the death of Hughes, his interest in the Wagner ledge was sold under proceedings in probate for five hundred dollars.   The most that such evidence could possibly have proved was that *the purchaser*, two years after the patent, thought that Hughes had an interest in the vein which was worth five hundred dollars.   As we have seen, the vein extended far beyond these lots, and, according to one witness, was worked at a point four hundred yards distant from them in 1876 or thereabouts.   Hughes's claim may have included this portion of the vein, but whatever it included, the opinion of the purchaser two years after the patent is not competent evidence of the known or estimated value of the vein at the date of the patent.

We find no error in the record.

Judgment and order affirmed.

McFARLAND, J., WORKS, J., SHARPSTEIN, J., THORNTON, J., and PATERSON, J., concurred.

Rehearing denied.