[Civil No. 2346.   Filed July 17, 1925.]

[238 Pac. 395.]

## MRS. CALPHURNIA GALLAGHER, T. D. GALLAGHER, J. B. GALLAGHER, O. R. CAFFERKEY and MATILDA REUTER, Appellants, v. BOQUILLAS LAND & CATTLE COMPANY, a Corporation, Appellee.

1. PUBLIC LANDS—PATENT RESERVING MINES AND MINERALS HELD TO CONVEY ALL MINES AND MINERALS NOT KNOWN PREVIOUS TO CONFIRMATION.—In an action to quiet title to plaintiff's granted land, confirmed by court of private land claims under Act of Congress March 3, 1891, in which defendants alleged claims to certain portions by virtue of mining locations, *held* that patent to plaintiff, issued under act referred to, which reserved gold, silver, and quicksilver, conveyed all mines and minerals except such gold, silver, and quicksilver mines, and their minerals, as were known at time of confirmation of claim to contain minerals of such extent and value as to justify expenditure for the purpose of extracting them.

2. PUBLIC LANDS — ALLEGATIONS HELD INSUFFICIENT TO SUSTAIN CLAIMS TO MINES EXISTING ON GRANTED LAND.—In action to quiet title to land acquired under Act of Congress March 3, 1891, defendants' allegation that certain mines thereon were known and had been worked as gold and silver mines previous to plaintiff's confirmation *held* insufficient to sustain a claim of ownership for failure to allege any privity with rights existing at that time, or that they were valuable at the time of confirmation; it being immaterial that they adjoined claims of proven value.

See (1) 27 **Cyc.**, p. 543.   (2) 27 **Cyc.**, p. 543.

APPEAL from a judgment of the Superior Court of the County of Cochise. A. M. Sames, Judge. Affirmed.

Mr. O. Gibson, for Appellants.

Mr. Fred Sutter and Mr. Walter Roche, for Appellee.

JONES, Superior Judge.—This is an action by appellee, Boquillas Land & Cattle Company, plaintiff below, against Mrs. Calphurnia Gallagher et al., appellants and defendants, below, to quiet plaintiff's title to a designated portion of a tract of land in Cochise county, Arizona, known as San Juan de las Boquillas y Nogales Mexican land grant, which the complaint alleges was confirmed by the court of private land claims under the provisions of the Act of Congress March 3, 1891 (chapter 539, 26 Stat., p. 854; 6 F. S. A., p. 58; Comp. Stats., 1901, p. 765), resulting in a patent from the United States to the plaintiff, dated December 14, 1900. The defendants are alleged to make without right claim to certain portions of such land by virtue of attempted mining locations.

One of the provisions of the act above mentioned is:

"No allowance or confirmation of any claim shall confer any right or title to any gold, silver, or quicksilver mines or minerals of the same, unless the grant claimed effected the donation or sale of such mines or minerals to the grantee, or unless such grantee has become otherwise entitled thereto in law or in equity; but all such mines and minerals shall remain the property of the United States, with the right of working the same, which fact shall be stated in all patents issued under this act. But no such mine shall be worked on any property confirmed under this act without the consent of the owner of such property until specially authorized thereto by an act of Congress hereafter passed." Section 13, subdivision 3.

Pursuant to this provision, there was incorporated in plaintiff's patent words of reservation of equi-. valent effect.

The defendants answered, admitting the existence of the grant, its confirmation and the patent, and averred that the grant did not affect a donation of gold, silver, and quicksilver mines or their minerals;

that the grantee had not become entitled thereto otherwise in law or in equity; that the same were reserved to the United States and open for location; that defendants and their predecessors in interest, at various times from 1916 to 1921, duly located within the exterior limits of the land described in the complaint eleven different mining claims, in each of which a discovery of mineral in place bearing values of gold and silver was made. As to four of the claims, it is alleged:

"The said claim was known and had been worked as a mine of gold and silver, and yielded large amounts of said metals long prior to the time when the said grant of plaintiff was confirmed by the Court of Private Land Claims."

It is also alleged that the district in which the claims are located is one of the oldest in Cochise county, and that "hundreds of shafts, cuts, and other openings are to be seen upon and in the immediate vicinity of said claims, and out of said workings have been taken large amounts of valuable gold and silver ores; that abutting one of said claims and lying almost wholly within the exterior boundaries of the aforesaid grant is the Dean Richmond Lode, which was patented by the United States to persons other than the owners or claimants of said grant long prior to the confirmation of said grant by the Court of Private Land Claims, but after said grant had been made by the government of Mexico."

Affirmative relief is prayed that defendants' title to such mining claims be quieted.

The plaintiff's demurrer to the answer was sustained. Defendants declined to amend, and judgment went for the plaintiff, quieting its title against defendants' locations. This appeal resulted.

We deem it unnecessary to determine whether the issuance of the patent of confirmation is a conclusive

adjudication that no gold, silver, or quicksilver mines existed at the date of the patent within the land granted, and for the purpose of this opinion will accept appellant's view that it is not such an adjudication. What then passed by the patent, and what was reserved?

We think that all minerals passed to the confirmee except gold, silver, and quicksilver mines and "minerals of the same." Appellants' argument that Sonora, Mexico, which made the grant, retained all minerals in the soil, and that the United States became the owner thereof by the treaty with Mexico, may be conceded to be true, but there was nothing to prevent the United States from conveying all or such portion of those minerals as it might think advisable. It is true that the patent does not expressly convey minerals, but the language of the statute is, to our mind, clear beyond argument, that Congress intended that there should pass by the patent all minerals except "gold, silver, or quicksilver mines or minerals of the same." By reserving specifically such mines and their minerals, it would seem clear that other mines and minerals were intended to be within the effect of the conveyance.

The fact that the so-called regalian theory existed in Mexico whereby minerals in the ground are reserved to the government as one of its prerogatives, and consequently do not pass by a grant of the land unless expressly mentioned, does not alter the case. That theory is entirely out of harmony with our form of government. The United States acquired the minerals; not this theory. *Fremont* v. *Flower*, 17 Cal. 199; *Moore* v. *Smaw*, 17 Cal. 199, 79 Am. Dec. 123.

There is nothing to the contrary in *Boquillas Land & Cattle Co.* v. *Curtis*, 213 U. S. 339, 53 L. Ed. 822, 29 Sup. Ct. Rep. 493 (see, also, Rose's U. S. Notes). In that case the confirmee of the grant here in ques-

tion claimed certain riparian rights which were not within the effect of the grant as originally made; the contention being that such riparian rights existed in the United States and were released to the patentee by the patent. The court said:

"The plaintiff draws another argument from the effect of the United States patent. It contends that the patent not only confirms the Mexican title, but releases that of the United States (*Beard* v. *Federy,* 3 Wall. 478, 491, 18 L. Ed. 88, 92), and that, by the grant from the United States, it gained rights as a riparian proprietor that could not be displaced by a subsequent attempt to appropriate the water (*Sturr* v. *Beck,* 133 U. S. 541, 33 L. Ed. 761, 10 Sup. Ct. Rep. 350). But, while it is true that in *Beard* v. *Federy, supra,* Mr. Justice FIELD calls such a patent a quitclaim, we think it rather should be described as a confirmation in a strict sense. 'Confirmation is the approbation or assent to an estate already created, which, as far as is in the confirmer's power, makes it good and valid; so that the confirmation doth not regularly create an estate; but yet such words may be mingled in the confirmation, as may create and enlarge an estate; but that is by the force of such words that are foreign to the business of confirmation.' Gilbert, Tenures, 75. It is not to be understood that when the United States executes a document on the footing of an earlier grant by a former sovereign, it intends or purports to enlarge the grant. The statute under which the Mexican title was decided to be good speaks of confirmation throughout, and, in the most pertinent passage, directing a patent to be issued says that it shall be issued 'to the confirmee' [citing statute]. It would be possible, perhaps, to argue to the contrary from provisions in sections 8 and 13, that the confirmation shall only work a release of title by the United States, but we are satisfied that the true intent of the statute and the reason of the thing are as we have said."

This language must be interpreted in the light of the facts of that case. Riparian rights were not in

any way dealt with by the act, thus leaving the question of the effect of the patent in that regard open to general considerations. The section here in question was not there involved or considered. As stated in the quotation from Gilbert, Tenures, "but yet such words may be mingled in the confirmation, as may create and enlarge the estate." This we think, for the reasons already stated, occurred here.

Nor is the opinion in *Lockhart* v. *Johnson,* 181 U. S. 516, 45 L. Ed. 979, 21 Sup. Ct. Rep. 665, expressive of any views inconsistent with our own. That case involved the validity of a mining location upon land which was then being claimed as part of the Conchiti Mexican land grant before the court of private land claims under this statute. It developed upon subsequent confirmation of the grant that such land was not a part thereof and was therefore public. The question considered by the Supreme Court was whether the fact that it was claimed before the court of private land claims as a part of the grant effected a segregation, pending judgment by that court, from the public domain, so as to preclude its acquisition under the mining laws. The court held that under the eighth section of the earlier act of 1854 all land included within a claimed land grant was so segregated, but that such section had been repealed by the fifteenth section of the act of 1891, with the result that any public land not actually within the limits of the grant as eventually confirmed was open to location, notwithstanding a claim thereto was then being made before the court of private land claims. Having so held, the court then continued:

"Mineral lands are not supposed to have been granted under ordinary Mexican grants of lands, and the act of 1891 provides that minerals do not pass by such grants, unless the grant claimed to effect the donation or sale of such mines or minerals to the grantee, or unless such grantee became otherwise en-

titled thereto in law or in equity; the mines and minerals remaining the property of the United States, with the right of working the same, but no mine was to be worked or any property confirmed under the act of 1891 without the consent of the owner of such property, until specially authorized thereto by an act of Congress thereafter to be passed. Section 13, subd. 3, Act of 1891. This provision makes it still plainer that, so far as regards mineral lands, there was no intention after the passage of the act of 1891 that they should be reserved by a mere claim in a Mexican grant of ordinary land.''

This was at most a general statement of the purposes of the act to emphasize the holding already indicated, and was not intended as an authoritative interpretation of the exact extent of the reservation.

Nor do we think the provisions of the Howell Code of Arizona, to which counsel called our attention at the oral argument, affect the question. The matter we have under consideration is the effect of an act of Congress providing for the disposition of public lands in which the territory had no interest, and we are unable to appreciate how any legislation by such territory is controlling.

We hold therefore that, while the patent was one of confirmation, it carried with it all minerals except gold, silver, and quicksilver mines and minerals of the same. It is such mines and their minerals that are reserved.

What then are mines within the meaning of this act? The question seems never to have been passed upon by any appellate court, but Secretary of the Interior Hitchcock, when requested to give his opinion of a bill before Congress providing for legislation to effectuate the proviso in the act, said:

''This view is strengthened by the declaration in the act that no *such mine* shall be *worked* on any confirmed claim without the consent of the owner thereof until specially authorized by a future act of Congress.

What Congress had in mind evidently was the reservation and future *working of mines* of gold, silver, or quicksilver, existing within the limits of a confirmed claim at the time of confirmation. The act deals with gold, silver, and quicksilver *mines,* and minerals of the *same;* that is, minerals of the *mines.* To properly come within the designation of *mines,* the existence of the minerals referred to must have been known at the date of the decree of confirmation.''

''It is not in terms declared that no allowance or confirmation of any claim shall confer any right or title to 'minerals of gold, silver, or quicksilver not known to exist in the land at the time of confirmation of the claim, and which may be discovered after confirmation and patent. To so construe the act would tend to disturb and render uncertain all titles issued upon decrees of confirmation made by the Court of Private Land Claims. It cannot be considered that Congress contemplated a result so unreasonable and so manifestly out of harmony with all previous legislation relating to the disposal of the public lands, in the absence of language plainly and unmistakably expressive of such intention. There is nothing in the statute which requires or would warrant such a construction.'' (Italics are not ours.) Lindley on Mines, 3d ed., § 127.

The meaning of the word as used in other statutes has been considered in cases sufficiently analogous to throw light on the question. Thus, in the case of *Davis* v. *Weibbold,* 139 U. S. 507, 35 L. Ed. 238, 11 Sup. Ct. Rep. 628, the question presented was the meaning of the word ''mine'' found in the reservation (section 2392, U. S. R. S. [U. S. Comp. Stats., § 4798]) from grants of town sites. Said the court:

''After much consideration we have come to the conclusion that this question must be answered in the negative. It is true the language of the Revised Statutes touching the acquisition of title to mineral lands within the limits of townsites is very broad. The declaration that 'no title shall be acquired' under the provisions relating to such townsites, and the

sale of lands therein 'to any mine of gold, silver, cinnabar or copper; or to any valid mining claim or possession held under existing laws,' would seem on first impression to constitute a reservation of such mines in the land sold, and of mining claims on them, to the United States; but such is not the necessary meaning of the terms used; in strictness they import only that the provisions by which the title to the land in such townsites is transferred shall not be the means of passing a title also to mines of gold, silver, cinnabar or copper in the land, or to valid mining claims or possessions thereon. They are to be read in connection with the clause protecting existing rights to mineral veins; and with the qualification uniformly accompanying exceptions in Acts of Congress of mineral lands from grant or sale. Thus read they must be held, we think, merely to prohibit the passage of title under the provisions of the Townsite Laws to mines of gold, silver, cinnabar or copper, which are known to exist, on the issue of the townsite patent, and to mining claims and mining possessions, in respect to which such proceedings have been taken under the law or the custom of miners, as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried unknown in the depths of the earth. The exceptions of mineral lands from pre-emption and settlement and from grants to States for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvement, are not held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness and to justify expenditure for its extraction, and known to be so at the date of the grant. There are vast tracts of country in the mining states which contain precious metals in small quantities, but not to a sufficient extent to justify the expense of their exploitation. It is not to such lands that the term mineral in the sense of this Statute is applicable.''

The question was also presented to the Supreme Court of California. There the attempt had been

made to locate ground within the exterior limits of
lands theretofore patented under the town-site laws;
the claim being that such locations were of mines ex-
isting when the patent issued. *Richards* v. *Dower*, 81
Cal. 44, 22 Pac. 304. Said that court:

"A mine is not reserved unless it is not only known,
but known to be valuable at the date of the patent, or
discovered to be so before the occupation or improve-
ment of the lots containing them for residences or
business under the townsite title. Here the defend-
ants admit that the lots in controversy are within the
description of the patent, and they must assume, as
they have in fact done, the burden of showing that
they are of the class of lands excepted from its opera-
tion. This they have failed to do, both in their alle-
gations and in their proofs, by failing to show that
that portion of the Wagner ledge included within the
boundaries of these lots was known to be valuable
for mining purposes at the date of the patent, or dis-
covered to be so before plaintiffs and their predeces-
sors occupied and improved them for the purposes
of residence under the townsite title. The tacit
assumption upon which appellants base their whole
argument, viz., that this ledge, having once been
profitably worked, must be deemed to have continued
valuable, cannot be admitted. It is a matter of uni-
versal knowledge that California is full of quartz
veins, which have been worked at a profit for a
time, and have been finally abandoned—often after
sinking more money in them than had ever been taken
out of them, and there are large areas where placer
mining was formerly conducted successfully, which
now, after being exhausted of their gold, are held and
occupied as farming and grazing lands under patents
from the United States."

The case was carried to the United States Supreme
Court, which said in its opinion of affirmance:

"The essential difference between this proposition
and that affirmed by the Supreme Court of the state
of California is that the plaintiffs in error insist that
if the ledge in question was known to have been gold

bearing and to have been profitably worked before the acquisition of the townsite patent, and had not in fact been worked out before the acquisition of that patent, the right to that ledge was not included in the patent, but was reserved to the United States, and would pass by a subsequent mining location; whereas the court held that if the ledge was not known, at the time of the acquisition of the townsite patent, to contain such an amount of minerals, as to be valuable for mining purposes, it was not excepted from the operation of that patent. There can be no doubt that the decision of the supreme court of the state in this respect was correct. It is established by former decisions of this court, that, under the acts of Congress which govern this case, in order to except mines or mineral lands from the operation of a town site patent, it is not sufficient that the lands do in fact contain minerals, or even valuable minerals, when the town site patent take effect; but they must at that time be known to contain minerals of such extent and value as to justify expenditures for the purpose of extracting them; and if the lands are not known at that time to be so valuable for mining purposes, the fact that they have once been valuable, or are afterwards discovered to be still valuable, for such purposes, does not defeat or impair the title of persons claiming under the townsite patent. *Deffeback* v. *Hawke,* 115 U. S. 392 [6 Sup. Ct. Rep. 95] (29 [L. Ed.] 423); *Davis* v. *Weibbold,* 139 U. S. 507 [11 Sup. Ct. Rep. 628] (35 [L. Ed.] 238)," 151 U. S. 658, 38 L. Ed. 305, 14 Sup. Ct. Rep. 452.

The California Supreme Court again had the question before it in the case of *Smith* v. *Hill,* 89 Cal. 122, 26 Pac. 644, where it said:

"The term 'mine of gold, silver, cinnabar, or copper,' as used in the exception found in the act and in the reservation of the patent, means a paying mine known to exist at the time of the grant to the county judge, or one which there was good reason to believe then existed."

In the light of these authorities, we hold that there was reserved from the operation of the patent only

such gold, silver, and quicksilver mines as were known
to contain minerals of such extent and value as to
justify expenditures for the purpose of extracting
them, including the minerals of such mines.

It follows that the seven locations which were upon
ground not previously known to be mineral are in-
valid. It remains to consider the other four.

As to each of these it is alleged that "said claim
was known, and had been worked as a mine of gold
and silver, and yielded large amounts of said metals
long prior to the time when the said grant of plain-
tiff was confirmed by the court of private land
claims." No privity is claimed with any rights that
existed at such times. When the demurrer to the
answer was sustained, the defendants stood upon
their answer.

There is no allegation that at the time the patent
issued these claims were located or possessed under
the laws of the United States. As Mr. Lindley sug-
gests, a location might be considered a mine (section
176, *supra*), but the allegation that the claim was
known is not enough.

While it is alleged that, long prior to the confirma-
tion, these claims had been worked and yielded large
amounts of gold and silver, there is no allegation that
they were being so worked or making such a yield
at the time of confirmation or the date of the patent.
For aught that appears from the answer, they might
have then been regarded as utterly worthless.

Nor do the allegations that the claims are in a well-
known mining district, and that there are hundreds
of shafts, etc., "to be seen upon and in the immediate
vicinity of said claims" add anything to the answer.
It is not alleged that such conditions existed when the
patent issued, and, even if the answer were suscep-
tible of that interpretation, it would not follow that
these particular claims then had any value, known or

unknown. An utterly worthless claim often adjoins one of proven value.

Nor is the allegation that the Dean Richmond patented claim covers land within the grant of any relevancy. No claim is made thereunder.

It is not our desire, in a case of this importance, to limit upon technical considerations the effect of the pleadings. As we have pointed out, when the court below sustained plaintiff's demurrer to defendants' answer, the defendants elected to stand thereon. The legal conclusion that defendants were content with their averments and must stand thereon is particularly applicable, because we know that appellants' counsel, whose learning in this branch of the law is well known, would not have omitted any allegation of fact susceptible of proof which could have aided his clients' cause.

Consequently we must hold these four claims likewise to be invalid.

Judgment affirmed.

McALISTER, C. J., and ROSS, J., concur.

LOCKWOOD, J., deeming himself disqualified, the Honorable GERALD JONES, Judge of the superior court of Pima county, was called to sit in his stead.